[Cite as *In re J.W.*, 2026-Ohio-2586.]

# IN THE OHIO COURT OF APPEALS
## FIFTH APPELLATE DISTRICT
## TUSCARAWAS COUNTY, OHIO

| | |
|---|---|
| IN RE: J.W. AND N.M. | Case No. 2025 AP 12 044 |
| | Opinion And Judgment Entry |
| | Appeal from the Court of Common Pleas, Juvenile Division, Case No, 24JN00289 |
| | Judgment: Affirmed |
| | Date of Judgment Entry: July 6, 2026 |

**BEFORE:** Andrew J. King; William B. Hoffman; Robert G. Montogmery, Judges

**APPEARANCES:** ANDREW R. FLOOR, for Appellee – Tuscarawas County Job & Family Services; JUDITH M. KOWALSKI, for Appellant – Mother; KAYLA MASZCZAK, for Child J.W., ANASTASIA DUNIGAN – Guardian ad Litem

*King, P.J.*

{¶ 1} J.D., mother of J.W. and N.M., appeals the judgment of the Tuscarawas County Juvenile Court which terminated her parental rights and granted permanent custody of the children to the Tuscarawas County Department of Job and Family Services (TCJFS). We affirm the trial court.

## Facts and Procedural History

{¶ 2} On September 9, 2024, the Tuscarawas County Court of Common Pleas Juvenile Division issued an emergency ex parte order for the Tuscarawas County Department of Job and Family Services (TCJFS) to take temporary custody of 13-year old J.W. and 10-year old N.M. due to mother's alcohol abuse and lack of stable housing.

{¶ 3}   An adjudicatory hearing was held on November 5, 2024 and the trial court found J.W. and N.M. to be dependent and maintained them in the custody of TCJFS.

{¶ 4}   On November 4, 2024, TCJFS filed a case plan. Concerns included mother's unresolved mental health challenges, lack of stable housing, and her history of alcohol and drug abuse. The plan required mother to acquire stable employment and housing to meet the needs of the children, complete a psychological assessment and comply with recommended treatments, submit to drug screens as requested by TCJFS, maintain sobriety and attend weekly counseling sessions. The trial court adopted the case plan and made it an order of the court.

{¶ 5}   The trial court held regular review hearings. On each occasion the court found TCJFS had made reasonable efforts to prevent the removal of the children from their home and maintained the children in the temporary custody of TCJFS.

{¶ 6}   On August 5, 2025, TCJFS filed a motion for permanent custody. A hearing on the motion took place on November 17 and 21, 2025.

{¶ 7}   Evidence presented by TCJFS demonstrated that mother put little effort into her case plan. During the pendency of the matter she moved 10 times. She resided in hotels, homeless shelters, jail, and sober living housing in Tuscarawas County, Hamilton County, and Florida. Her longest stay in any one place was two and a half months. Mother's frequent moves made it difficult for TCJFS to connect her with services.

{¶ 8}   Mother also had six different jobs during the life of the case. At the time of the permanent custody hearing, she was unemployed.

{¶ 9}   Mother was directed to participate in a psychological evaluation with Dr. Aimee Thomas at the Lighthouse Family Center. She attended two sessions before cancelling

the third. Nonetheless Dr. Thomas obtained enough information to offer an opinion and diagnosed mother with generalized anxiety disorder, a provisional diagnosis of bipolar disorder, other specified personality disorder, and alcohol use disorder. Dr. Thomas found mother accepted no responsibility for the children being removed from her care and instead blamed the children.

{¶ 10} Mother additionally refused to follow any recommendations from Dr. Thomas. She instead developed a conspiracy theory that Dr. Thomas and TCJFS conspired to permanently remove children from their families. She wrote the President of the United States, Donald Trump, Vice President, J.D. Vance, and every Ohio State Senator and State Representative demanding an investigation into TCJFS. She additionally filed a complaint against Dr. Thomas with the Ohio Board of Psychology. Dr. Thomas opined this behavior was consistent with an episode of mania in a person with bipolar disorder.

{¶ 11} Mother further failed to cooperate with TCJFS staff attempting to assist her in the completion of her case plan goals. In June, 2025, mother emailed her caseworker demanding that TCJFS refrain from contacting her and claiming she would obtain a restraining order if there was any further contact. She did however comply with random drug testing and never had a positive test.

{¶ 12} J.W. resided in several treatment placements during the life of this case. J.W. struggles with significant behavioral issues requiring medication which he at times refused to take or did not receive resulting in behavioral outbursts. Although her visits with J.W. remained supervised, mother and J.W. maintained a strong relationship. During visits mother was observed to be appropriate and supportive of J.W. J.W. vacillated between wanting to reunite with mother and not wanting to reunite.

{¶ 13} N.M. however, had no desire to reunite with mother. N.M. participated in a trauma evaluation with Carrie Schnirring at Lighthouse Family Center. N.M. discussed numerous instances of physical abuse and violence perpetrated by mother including mother pulling her hair, punching her, throwing things at her, and telling N.M. she would kill her in her sleep. Mother told N.M. she was sorry she ever had a daughter. N.M. stated she was tired of reunification because each time they were reunified mother would return to her previous behaviors of alcohol abuse and the resulting aggression towards N.M. Moreover N.M. disliked mother's constant need to move for a "clean slate." N.M. explained that school was her only escape from mother and she had to make new friends every time they moved. N.M. wished to remain in her current foster home and to be adopted. No visitation took place between N.M. and mother during the life of the case because the trial court ordered there be no visitation until N.M had completed trauma counseling.

{¶ 14} Mother chose to engage in counseling from September 18, 2024 to March 20, 2025 with Nathan Jones, a clinical counselor, at Springvale in Dover, Ohio. They had eight sessions, most of which were by phone. Jones diagnosed mother with adjustment disorder with mixed anxiety and depressed mood. It is beyond Jones' scope of practice to determine if an individual is fit for parenting. Jones testified that mother did not demonstrate symptoms of bipolar disorder during his treatment of her, but also stated that individuals with bipolar disorder may go weeks, months, or years in between manic episodes. Jones' treatment of mother was based only on mother's self-reports. He was unaware that the children had been removed from mother's custody several times, her criminal background, and of her pattern of moving constantly. Jones agreed that without mother's full background, it would not be possible to rule out a diagnosis of bipolar disorder. Jones was further unaware that mother

was an alcoholic and had been in three different treatment facilities in two different states within five months.

{¶ 15} The guardian ad litem (GAL) testified that her recommendation was for permanent custody. The GAL's concerns included mother's lack of stability which she believed was heavily tied to mother's mental health challenges, and the fact that instead of addressing the requirements of her case plan, mother instead directed her energies into fighting the need for services. She noted that the children have been removed from mother's custody on multiple occasions for the same reasons.

{¶ 16} On December 4, 2025, the trial court granted permanent custody of J.W. and N.M. to TCJFS.

{¶ 17} Mother timely filed an appeal and the matter is now before this court for consideration. She raises five assignments pf error as follows:

I

{¶ 18} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THIS APPELLANT-MOTHER IN VIOLATION OF HER DUE PROCESS RIGHTS UNDER THE 14TH AMENDMENT, BY GRANTING PERMANENT CUSTODY OF THE SUBJECT CHILDREN TO THE TUSCARAWAS DEPARTMENT OF JOB AND FAMILY SERVICES AS THE CHILDREN HAD BEEN IN TEMPORARY CUSTODY FOR LESS THAN ONE YEAR."

II

{¶ 19} "THE AWARD OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

III

{¶ 20} "THE TUSCARAWAS COUNTY JUVENILE COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILD, WHEN THE GUARDIAN AD LITEM ADMITTED THAT SHE HAD NEVER DONE A HOME VISIT WITH THE MOTHER NOR OBSERVED MOTHER AND DAUGHTER TOGETHER IN VIOLATION OF OHIO SUP.R.48."

IV

{¶ 21} "THE JUVENILE COURT DID NOT MAKE SUFFICIENT INDICATION ON THE RECORD THAT IT ONSIDERED ALL OF THE FACTORS IN O.R.C.2151.414."

V

{¶ 22} "THE JUVENILE COURT ERRED IN GRANTING PERMANENT CUSTODY WHEN THE TUSCRAWAS COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES DID NOT ENGAGE IN DILIGENT CASE PLAN NOR MAKE REASONABLE EFFORTS TO REUNIFY THE FAMILY."

I, II, III, IV, V

{¶ 23} Mother's arguments are interrelated and will therefore be addressed together.

**Applicable Law**

**Standard of Review**

{¶ 24} The Supreme Court of Ohio has explained that the appropriate appellate standard of review of a trial court's permanent-custody decision is the manifest-weight standard and/or a sufficiency-of-the-evidence standard, depending on the nature of the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 25} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *In re: Z.C.*, 2023-Ohio-4703, ¶13. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when 'the evidence is legally sufficient to support the jury verdict as a matter of law.' " *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, 678 N.E.2d 541, quoting Black's at 1433." *Id.*

{¶ 26} On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). In *Thompkins*, supra, at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990), the Supreme Court of Ohio explained the following:

> Weight of the evidence concerns "the inclination of *the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find *the greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." [Emphasis sic.]

{¶ 27} In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 2012-Ohio-2179. Additionally, " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Seasons Coal Co.*, 10 Ohio St.3d 77, 80, (1984), quoting *C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279, 280-281 (1978).

### Due Process & Child Custody

{¶ 28} Although "due process" lacks precise definition, courts have long held that due process requires both notice and an opportunity to be heard. *In re Thompkins*, 2007-Ohio-5238, ¶ 12. We recognize "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court].' " *In re B.C.,* 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 120 S. Ct. 2054 (2000). The Ohio Supreme Court has also "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.*, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977). (Other citations omitted.) Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed. Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *In re B.C.*, supra at ¶ 17. (Citations and quotations omitted.)

{¶ 29} Indeed, "[p]ermanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. Therefore, parents must be afforded every procedural and substantive protection the law allows." *Id*. at ¶ 19, (Citations

and internal quotations omitted). "In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair." *Id.* at ¶ 17.

{¶ 30} The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419. "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who . . . have been temporarily separated." *In re Evans*, 2001-Ohio-2302, *3 (3d Dist.). To that end, case plans establish individualized concerns and goals, along with the steps the parties and the agency can take to achieve reunification. *Id.*

### Permanent Custody

{¶ 31} R.C. 2151.414(B)(1) states in relevant part that permanent custody may be granted to a public or private agency if the trial court determines by clear and convincing evidence at a hearing held pursuant to division (A) of R.C. 2151.414, that it is in the best interest of the child and any of the following apply:

> ... (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code,

the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 32} R.C. 2151.414(B) therefore provides a two-pronged analysis the trial court is required to apply when ruling on a motion for permanent custody. In practice, the trial court will determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1) (a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**Best Interests**

{¶ 33} R.C. 2151.414(D) governs "best interests" and states:

(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ending on or after March 18, 1999;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**Temporary Custody for at Least 12 out of a Consecutive 22-month Period**

{¶ 34} The "12 of 22" provisions contained in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child. *In re C.W.,* 2004-Ohio-6411, ¶22. Through the "12 of 22" provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds. *Id.*

{¶ 35} Mother first argues the children had been in TCJFS custody for less than a year and therefore the trial court's reliance on the 12-of-22 months provision of R.C. 2151.414(E)(1)(d) was erroneous. We disagree.

{¶ 36} When TCJFS filed its motion for permanent custody on August 5, 2025, the children had been in the custody of *one or more* public children's services agencies for 12 or more months of a consecutive 22-month period. Twenty-two months prior, the children were in the temporary custody of the Belmont County Department of Job and Family Services. They were in the temporary custody of that agency from October 5, 2023 to February 21, 2024. Of the preceding 22-month period, the children spent three months in the temporary custody of Belmont County and nine months in the temporary custody of TCJFS. Transcript of trial (T.) 24-29, 393-395, TCJFS exhibits E 1 – E 11, Judgment Entry awarding permanent custody to TCJFS at 14. Mother's argument is therefore without merit.

{¶ 37} In addition, we note TCJFS produced evidence to support a finding pursuant to R.C. 2151.414(B)(1)(e) as the child or children have been adjudicated dependent on three or more occasions. Here, the children were removed from mother's custody twice in Florida and three times here in Ohio. N.M. has been adjudicated dependent on three occasions in Ohio; October 5, 2022, May 28, 2023, and in this matter on November 5, 2024. T. 22-25, 390-394.

**Manifest Weight**

{¶ 38} Mother next argues the trial court's award of permanent custody to TCJFS is against the manifest weight of the evidence. Specifically, mother argues the mental health

examiners in this matter were biased, that the guardian ad litem rendered an opinion without ever observing mother interacting with N.M and never met with mother except for before and after court hearings.

{¶ 39} Mother's allegation of bias hinges on the fact that Lighthouse Family Center has a contract with TCJFS to conduct evaluations in custody cases. T. 94, 150. According to mother "[h]aving this type of relationship with the Agency trying to sever a parent's rights is indicative of potential bias." Brief of Appellant at 25. Mother has provided no evidence to support a conclusion that Lighthouse routinely makes vindictive or dishonest findings and recommendations in order to assist TCJFS in severing a parent's rights. Nor has mother produced any evidence to demonstrate that TCJFS had anything to gain through conspiring with Lighthouse to sever family ties. We therefore reject mother's suggestion of bias based solely on an existing contract between Lighthouse and TCJFS.

{¶ 40} Moreover, contrary to mother's argument, the greater amount of credible evidence supports the trial court's decision granting TCJFS's motion for permanent custody. As discussed above, mother put minimal effort into achieving the goals of her case plan. While she touts her participation in counseling at Springvale, mother received counseling based only on her self-reporting. T. 49-56, 288. The counselor did not review collateral data and mother failed to disclose her alcoholism. The counselor testified that had he reviewed that data, his impressions, diagnosis and recommended therapy may have been different. T. 289-291. The current matter marks the third occasion that the children have been removed from mother's custody by an Ohio public children's services agency. T. 24, TCJFS exhibits E3, E7, judgment entry filed November 5, 2024. The children were removed from mother's custody once in Florida for a period of two years. T. 25.

{¶ 41} As of the date of the permanent custody hearing, mother had not adequately addressed her mental health, had no housing, was unemployed, had only been sober for one month, and the children had been in the temporary custody of TCJFS for more than 12 months of a 22-month period. This court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period, standing alone, is sufficient to award permanent custody. *In the Matter of A.S., V.S., and Z.S.*, 2013-Ohio-4018 (5th Dist.).

{¶ 42} While mother argues she should have been given a chance, the record reflects she has had many chances to provide consistent, appropriate housing, care, and support for her children and has failed to do so. We find the trial court's award of permanent custody to TCJFS is not against the manifest weight of the evidence.

### Guardian ad Litem

{¶ 43} Mother further argues the trial court's best interest findings are not supported by the record because the guardian ad litem (GAL) did not conduct a home visit with mother and did not observe mother and NM together. According to mother these are requirements pursuant to Ohio Sp. R. 48.03(D), which outlines the duties of a GAL. We disagree.

{¶ 44} We have previously addressed similar arguments and noted "R.C. 2151.281 governs a GAL's duties and provides the GAL "shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency. . .." There is no specific requirement contained in R.C. 2151.281 that a GAL must observe the parents with the children . . ." *In re M.G.*, 2023-Ohio-695, ¶ 73 (5th Dist.) We have further found "Rule 48(D) of the Ohio Rules of Superintendence

is a lengthy statement of the basic responsibilities of a GAL serving an Ohio Court which are to be performed unless impracticable or inadvisable to do so." *Id.* at ¶ 74.

{¶ 45} Mother appears to make a manifest weight argument. She argues that because the GAL did not comply with Sup. R. 48, her testimony cannot be considered competent credible evidence of N.M.'s best interest. Yet as outlined above mother never established stable housing. She moved 10 times during the pendency of this matter and lived in two different states, making a home visit impractical. T. 465-517. Moreover, visits between mother and N.M. were prohibited by the trial court until N.M. completed her trauma evaluation, and N.M. had no desire to visit with or reunite with mother. T. 214-215, 310-313, 594. To the extent that mother's argument could be construed as urging a right to enforce the guidelines contained in Sup. R. 48, we have held the rule does not create substantive rights. *In re: K.A.*, 2021-Ohio-1773 (5th Dist.).

### Best Interests Findings

{¶ 46} Mother next argues the trial court failed to make a sufficient indication on the record that is had considered all of the best interest factors contained in R.C. 2151.414.

{¶ 47} The judgment entry granting TCJFS's motion for permanent custody in this matter states in relevant part: "Considering all the factors listed in 2151.414 the Court finds that it is in the best interests of [J.W.] and [N.M.] to be placed in the permanent custody of the Tuscarawas County Department of Job and Family Services." Judgment Entry December 4, 2025 at 14. This statement was preceded by a discussion of the applicable factors contained in R.C. 2151.414(D)(1) including the children's history of temporary custody with several children's services agencies over a nine-year period, the fact that they had been in temporary custody for 12 months of consecutive 22-month period, their need for permanency, their

progress while in their respective placements, N.M.'s trauma, and the GAL's recommendations. Mother provides no authority that would support a finding that the trial court must make findings regarding every factor contained in R.C. 2151.141(D)(1). Indeed, the Supreme Court of Ohio has found a trial court need not expressly discuss each of the best interests factors as long as a reviewing court can discern from the juvenile court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors. *In re A.M.* 2020-Ohio-5102 ¶ ¶ 31, 33; *In re L.A.* 2024-Ohio-3436 ¶ 88 (5th Dist.) ("No one element is given greater weight or heightened significance. *In re C.F.*, 2007-Ohio-1104, 113 Ohio St. 3d 73, 862 N.E.2d 816,. R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision or judgment entry a written discussion of each of those factors. *In re: A.M.*, 2020-Ohio-5102, ¶33, 166 Ohio St. 3d 127, 184 N.E.3d 1.")

{¶ 48} Here the judgment entry clearly states the trial court considered all the factors set forth in R.C. 2151.414. Mother's argument is therefore without merit.

### Best Efforts

{¶ 49} Finally, mother argues the trial court erred in granting permanent custody to TCJFS when TCJFS failed to engage in diligent case planning and failed to make reasonable efforts to reunite the family. We disagree.

{¶ 50} We first note that mother never raised this issue below. The trial court found TCJFS had made reasonable efforts to prevent the removal of the children from their home on three occasions before the permanent custody hearing; in the Judgment entry filed on November 20, 2024 following the dispositional hearing, and the January 23, 2025 and April

17, 2025 judgment entries following review hearings. Mother never objected to these findings. She has therefore forfeited all but plain error.

{¶ 51} "In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson,* 79 Ohio St.3d 116, 121 (1997). This is not one such case.

{¶ 52} R.C. 2151.419 does not require a trial court to decide that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing. *In re C.F.,* 2007-Ohio-1104. As previously mentioned, the trial court found TCJFS had used reasonable efforts on three occasions before the permanent custody hearing.

{¶ 53} Mother's argument appears not to be that the trial court failed to make the appropriate finding, but rather that TCJFS should have done more. Mother complains TCJFS provided no visitation with N.M. and made no effort to provide any type of contact or therapy to assist in reestablishing the mother-daughter relationship. Yet under the same assignment of error, mother complains that the recommendations from her evaluation with Lighthouse Family Center were too extensive and "would have taken months to complete." Brief of Appellant at 29. While mother argues more services were needed, as previously discussed, mother failed to comply with most of the goals of her case plan and failed to help herself or her children by constantly moving and making the implementation of services that much harder. "The issue is not whether there was anything more the agency could have done, but

whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re J.H*, 2019-Ohio-5184, ¶ 54 (5th Dist.). The record reflects mother was resistant to most recommendations despite the best efforts of TCJFS. We therefore reject mother's complaints.

{¶ 54} Based on the foregoing, mother's five assignments of error are overruled and the judgment of the Tuscarawas County Court of Common Pleas is affirmed.

Costs to Appellant.

By: King, P. J.

Hoffman, J. and

Montgomery, J. concur.